

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

KAREN GRAY,                          ]
                                     ]
    Plaintiff(s),            ]
                                     ]
vs.                                  ]     CV-99-N-2991-S
                                     ]
HEALTH SERVICES EAST, INC.,          ]
                                     ]
    Defendant(s).            ]

## Memorandum of Opinion

**ENTERED**
OCT 1 5 2001

### I. Introduction.

The court has for consideration defendant's motion for summary judgment, filed October 13, 2000. The above-styled action was initially assigned to a magistrate judge pursuant to the Court's General Order of Referral of Civil Matters to Magistrate Judges. Pursuant to 28 U.S.C. § 636(c), the parties declined to submit to final dispositive jurisdiction by the magistrate judge. Therefore, he subsequently entered a report and recommendation on the defendant's motion for summary judgment on August 22, 2001, finding summary judgment due to be denied. (Doc. # 25). Defendant then filed an objection to the report and recommendation on September 5, 2001. (Doc. # 26). The action has since been reassigned to this court. (Doc. # 29). The issues raised by defendant's motion have been briefed by both parties and are ripe for decision. Upon due consideration, the motion will be **GRANTED**.

**II.   Background.**

Between the months of November 1997 and January 1998, plaintiff Karen Gray, (hereinafter "Gray" or "plaintiff"), an African-American female, worked as a Registered Nurse for Lakeview Nursing Home, a long-term care facility operated by defendant Health Services East (hereinafter "HSE," "Lakeview" or "defendant"). (Doc. # 3; Doc. # 12, Tb. 5, p. 2). HSE hired plaintiff on November 4, 1997, and terminated her employment on January 28, 1998. (Doc. # 12, Tb. 4, p. 4; Tb. 5, p. 2). As all new employees are required to undergo a 180-day probationary period, plaintiff was still a probationary employee at the time of her termination. (*Id.*, Tb. 5, p. 2). The decision to terminate plaintiff was made by the facility administrator Joyce Campbell. (*Id.*, Tb. 5, pp. 3-4). Following her termination, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on January 29, 2001, claiming that she had "been subjected to different terms and conditions of employment with respect to disciplinary actions and tardiness." (*Id.*, Tb. 4, pp. 3-4). She further alleged that she had been discriminated against on account of her race, and in retaliation for not reporting on an employee. (*Id.*).

Gray commenced the above-styled action on November 8, 1999. (Doc. # 1). In her complaint she invoked the court's jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. (*Id.*). As a cause of action Gray alleged "Title VII/Race Discrimination." She claimed that HES had (1) denied her a promotion for which she was qualified and had hired a less-experienced white employee; (2) had discriminated against her with respect to compensation, terms, conditions, and privileges of employment on account of her race; (3) subjected her to a racially charged

2

environment; and (4) terminated her on account of her race. (*Id.*). In a later deposition, plaintiff made statements affecting the scope and allegations of her action. Particularly, she stated that HES had subjected her to unlawful discrimination during the hiring process; but that she had never sought any promotion or advancement while employed with HES. (Doc. 12, Tb. 1, pp. 19-21; 39).

Plaintiff offers a plethora of factual assertions in opposition to defendant's motion for summary judgment. She avers direct evidence of discriminatory motive in several forms: (1) an EEOC memorandum stating that the "Director of Nursing [Michelle Crane] admits that she was directed to terminate black employees"; (2) affidavit testimony by former Lakeview employee Michelle Singleton asserting personal knowledge that African-American employees were singled out for termination; (3) an alleged statement by the Vice President of Human Resources Katie Chamblee ordering the termination of a black employee on account of her potential union sympathies; (4) deposition testimony of Crane recounting a conversation with Shelia Harvey, secretary for facility administrator Joyce Campbell, in which Harvey said that Campbell was a racist; and (5) allegations that Lakeview employee Johnnie Weathers frequently used the words "niggers" or "you people" to refer to African-American employees. (Doc. # 14; Doc. # 15, Tb. 1-5; Doc. # 18). Gray also directs the court's attention to numerous instances where Lakeview management less severely disciplined non-minority employees for infractions similar to those committed by plaintiff. (Doc. # 14). She claims that these instances demonstrate favorable treatment by the management of similarly situated non-minority employees on account of their race. Finally, plaintiff describes instances of alleged discrimination involving her hiring process,

the conditions of her employment, and instances involving alleged segregation at the workplace eating area. (Doc. # 14).

The facts surrounding plaintiff's termination are relatively undisputed. Among plaintiff's professional duties was that of charting patient medical records. (Doc. # 12, Tb. 1, pp. 33, 124-25). On January 15, 1998, plaintiff made an entry on a patient's chart which included the following: "Foley patent." (*Id.*, p. 131). On January 16, 1998, plaintiff made an entry on the same patient's chart, which included the following notes: "Foley patent and draining freely." (*Id.*, p. 132). The term "Foley" refers to a Foley catheter, rubber tubing inserted into a patient's urethra to facilitate urination. (*Id.*, p. 127). The relevance of plaintiff's entries, however, is that the Foley catheter – recorded to be patent on January 15, 1998, and recorded to be patent and draining freely on January 16, 1998 – had in fact been removed from the patient on January 13, 1998. (*Id.*, Def. Ex. 6).

A letter written by Ms. Crane and attached to plaintiff's disciplinary memorandum described plaintiff's errors as constituting "a danger for the resident [and a] falsification of a record." (*Id.*). Plaintiff did not dispute her error at the time (nor does she dispute it now); she claimed, however, that the mistake was only a mistake in documentation. (*Id.*, p. 129 & Def. Ex. 6). Nonetheless, Ms. Campbell determined that the nature of plaintiff's error in documentation *a fortiori* intimated a failure on her part to assess the patient. (*Id.*, Tb. 5, p. 4; *see also id.*, Tb. 2, pp. 70-72). She therefore decided to terminate plaintiff, and directed Ms. Crane to state as much in the letter attached to plaintiff's disciplinary memorandum. (*Id.*, Tb. 5, p. 4; *see also* Doc. # 15, Tb. 19, pp. 55-56).

4

## III. Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a

5

reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

# IV.    Discussion.[1]

## A.    Plaintiff's Wrongful Termination Claim

In his report and recommendation, the magistrate judge concluded that plaintiff had established a prima facie case of discrimination in her termination. (Doc. # 25, p. 5).  In support, the magistrate discussed a situation where a non-minority probationary employee committed an offense worthy of termination, but had not in fact been fired.  According to the magistrate, this example served as "evidence that white employees were not fired for

---

[1] The court's analysis of plaintiff's Title VII claims simultaneously disposes of her § 1981 claims, because "the elements of a prima facie case . . . under Title VII are the same for employment claims brought pursuant to § 1981." *Shields v. Fort James Corp.*, No. 99-1048-S, 2001 U.S. Dist. LEXIS 5219, at *19 n.21 (S.D. Ala. Apr. 9, 2001); *see also Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1109 n.4 (11th Cir. July 9, 2001); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994).

6

similar offenses," and rendered plaintiff's case sufficient to withstand defendant's motion for summary judgment. (*Id.*).

"Title VII prohibits an employer from 'discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-2(a)(1)). "A plaintiff in a Title VII action may attempt to show this discrimination by offering either direct or circumstantial evidence. *Schoenfeld*, *supra*; *see also Hill v. Metropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1988), modified, 848 F.2d 1522 (11th Cir. 1988).

### 1. The Presence or Absence of Direct Evidence

HES acknowledges plaintiff's evidentiary submissions in opposition to its motion for summary judgment, but claims that none rises to the level of direct evidence. Specifically, the defendant argues that the EEOC memorandum, the affidavit testimony of Ms. Singleton, and Ms. Crane's statement concerning Ms. Campbell's alleged racism are inadmissible evidence beyond the court's consideration. (Doc. # 16). All the alleged instances of direct evidence, however, fail according to the defendant for the common reason that they do not relate to Ms. Campbell's decision to terminate plaintiff. (*Id.*).

"Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). "[D]irect evidence is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some

impermissible factor." *Schoenfeld*, 168 F.3d at 1266 (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)). "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). "If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld*, *supra* (citing *Burrell v. Board of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997)).[2]

Addressing defendant's latter contention first, the court agrees that the alleged statements of Katie Chamblee and Johhnie Weathers fail to meet the standards of direct evidence. With respect to Ms. Chamblee's statement, the record nowhere establishes any link between that statement, Ms. Chamblee and plaintiff's termination. The same can be said for the alleged comments of Mr. Weathers. Little value can be ascribed to these statements, then, insofar as they go toward direct evidence in support of plaintiff's case. *See also Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."). The court is aware that Ms. Chamblee, as the vice

---

[2] The court notes that authorities within the circuit appear in conflict over the precise definition of "direct evidence." In a recent case, Judge Tjoflat opined that "direct evidence" means "evidence from which a reasonable factfinder could find, by a preponderance of the evidence, a causal link between an adverse employment action and a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1294, (11th Cir. 1999). The other members of that panel concurred only in result, however, and, as observed last year in a case from the Southern District, the standard offered by Judge Tjoflat does not appear to have been adopted and applied in subsequent decisions. *See Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1123 (S.D. Ala. 2000).

8

president of human resources, may have some ultimate role in the employment of Lakeview personnel. But as far as plaintiff's termination, and this action, are concerned, the record simply does not demonstrate any part played by Ms. Chamblee. To conclude otherwise would necessarily require inferences that, by definition, would necessitate a characterization of this evidence as circumstantial.

The affidavit testimony of Ms. Singleton also fails to establish the presence of direct evidence. The court bases this conclusion largely upon the decision of the magistrate judge to strike Ms. Singleton's affidavit testimony, insofar as it referred to the state of mind of another. (Doc. # 24). The testimony affected by this order includes testimony plaintiff proffers as direct evidence: "Black employees were singled out to be fired by Joyce Campbell because she did not like the black employees." (Doc. # 18, Supp. Aff. of Michelle Singleton). This testimony specifically refers to the state of mind of another; i.e., Joyce Campbell. The decision of the magistrate, with which this court agrees, therefore precludes plaintiff from using that evidence.

The alleged statement of Ms. Harvey and the EEOC memorandum present somewhat different questions. The defendant does argue that the evidentiary submissions fail to meet the standards of direct evidence. (Doc. # 16). But the defendant also claims that both the statement and the memorandum are inadmissible evidence,[3] and therefore cannot be considered by the court on summary judgment. *See Macuba v. DeBoer*, 193 F.3d 1316, 1323-24 (11th Cir. 1999). The latter point is well-taken in considering Ms. Harvey's

_____

[3] Specifically, the defendant asserts that both the statement and the EEOC memorandum constitute inadmissible hearsay (with the EEOC memorandum being "triple" hearsay); and that both the statement and the memorandum contain inadmissible opinion evidence.

9

statement. As recounted by Ms. Crane in her deposition testimony, the statement is clearly a third-party statement being offered for its truth. The statement does not fit within any of the exceptions to the hearsay rule, and it does not appear to qualify under the law as non-hearsay. It is, therefore, properly excluded from consideration. *See Macuba v. DeBoer*, 193 F.3d 1316, 1323-24 (11th Cir. 1999); *see also Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565-66 (11th Cir. 1991).[4]

The contents of the EEOC memorandum (as well as the memorandum itself) are of another cloth. First, the evidentiary proffer actually involves conflicting statements in the memorandum. One statement, quoted by plaintiff, states: "Director of Nursing admits that she was directed to terminate black employees." (Doc. # 15, Tb. 1, p. 5). The factual account upon which this statement is based, however, reads: "Ms. Waybright also states that Ms. Crane told her that Joyce Campbell, Administrator, told her to get rid of 'you all.'" (Doc. # 15, Tb. 1, p. 4). The defendant thus argues that the statement is not direct evidence – because the statement does not clearly establish race to be a motivating factor for termination – and that the statement proffered by plaintiff is a legal conclusion of the investigator. (Doc. # 16, pp. 3-4). Furthermore, the factual account appears to contain not one, but four separate levels of hearsay (the memorandum, the statement of Wyvomia Waybright, the statement of Michelle Crane, and the alleged statement of Joyce Campbell). (Doc. # 15, Tb. 1, pp. 4-5).

---

[4] The court also believes the statement to be at the fringe of the standards for direct evidence. While the statement does go to the state of mind of the decision-maker in question, inferences and presumptions are required for the court to find that the statement relates to the state of mind of the decision-maker at the time of plaintiff's termination. *See Three Springs Residential Treatment*, 132 F.3d at 641.

Measuring the admissibility of an EEOC memorandum such as the present one is a decision within the sound discretion of the court. *See Lathem v. Dept. of Children & Youth Servs.,* 172 F.3d 786, 791 (11th Cir. 1999); *Barfield v. Orange County,* 911 F.2d 644, 650 (11th Cir. 1990). A factor bearing on admissibility, however, is the presence of legal conclusions in the memorandum. *See Barfield, supra.* The fact that such a conclusion may be present in the instant memorandum, however, is not the only disconcerting element in the proffer.[5] The court believes that not all of the four levels of hearsay in the factual accounting of the investigator fit within an exception or exclusion to the rule. Assuming that Ms. Campbell indeed made the statement alleged, that statement would likely qualify as an admission of a party opponent. *See* Fed. R. Evid. 801(d)(2); *see also Wilkinson,* 920 F.2d at 1565-66. Given the relationship between Ms. Campbell and Ms. Crane, as well as Ms. Crane's professional duties, the same determination would equally apply to Ms. Crane's statement to Ms. Waybright. *Id.* The memorandum qualifies as an exception under the Public Records and Reports exception. *See* Fed. R. Evid. 803(8); *see also Walker v. NationsBank N.A.,* 53 F.3d 1548, 1554 n.7 (11th Cir. 1995); *Barfield,* 911 F.2d at 650. However, no exception or exclusion appears applicable to Ms. Waybright's accounting of the story to the EEOC investigator. Specifically, the duties ascribed to Ms. Waybright do not, given the record, rise to such a level that would warrant a determination that her statement constituted an admission. *See Wilkinson,* 920 F.2d at 1565-66.

---

[5] The language of the report equally suggests that the "legal conclusion" is simply another statement relayed to the investigator by Ms. Waybright.

11

The presence of hearsay and legal conclusions in the memorandum are not the only reasons the court believes the evidence must be excluded from consideration. Plaintiff had ample opportunity to depose Ms. Crane, and the court finds it strange that her deposition testimony contains no direct (or even indirect) corroboration of the story relayed in the EEOC memorandum. In fact, the only apparent support may be derived from the following exchange:

Q:    Do you believe that Karen Gray's termination was, in part or totally, motivated by race?

A:    Maybe not totally motivated.

(Doc. # 15, Tb. 20, p. 165). As should be clear from the discussion *supra*, presumptions and inferences would be necessary for the court to conclude that this statement represents direct evidence.[6] The court thus finds that none of plaintiff's proffers rises to the level of direct evidence sufficient to support a claim of discrimination.

### 2.    **Plaintiff's Prima Facie Case**

Plaintiff can still establish a claim of discrimination sufficient to withstand summary judgment using the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a claim of discrimination in discipline . . . a plaintiff must first make out a prima facie case demonstrating: 1) that she belongs to a protected class under Title VII; 2) that she was qualified for the position; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline. *See Lathem*, 172

---

[6] Contrary to the claims of defendant, the court does not believe that this statement is inadmissible on the ground that it is "lay opinion on the ultimate issue . . . ." *See Carter v. Decisionone Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997).

F.3d at 792; *Holifield*, 115 F.3d at 1562; *Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989).  Once a plaintiff makes this showing, the burden of going forward shifts to the employer who must provide a specific, legitimate non-discriminatory reason for disciplining the employees differently. *See Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000).

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998).  "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (citations and quotations omitted).  In order to satisfy the requirements for this final prong, the comparator's offense must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Silvera*, 244 F.3d at 1259; *see also Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citation omitted); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.").

The defendant claims that plaintiff cannot establish the third prong of her prima facie case, as she cannot identify a similarly situated non-minority employee receiving favorable treatment.  Plaintiff directs the court to several individuals whom she claims are similarly situated for purposes of establishing a prima facie case.  Defendant argues, however, that

13

the circumstances surrounding these allegedly similar individuals sufficiently distinguish them from plaintiff, thereby making them inappropriate comparisons.

Plaintiff's most remarkable example concerns Ms. Singleton and a dietary aide Jackie Phillips.[7] The record reflects that Ms. Singleton, in an attempt to convince an uncooperative patient with "critically high" blood sugar to take an insulin injection, permitted, under supervision, a non-licensed facility employee to give the patient the injection. (Doc. # 12, Tb. 3, pp. 200-03; Doc. # 15, Tb. 10). At the time of the incident, Ms. Singleton, like plaintiff, was in her 180-day probationary period. (Doc. # 12, Tb. 5, p. 2; Doc. # 15, Tb. 12).[8] In her deposition testimony, Ms. Crane claimed that the seriousness of the actions justified termination.[9] Nonetheless, both Ms. Singleton and Ms. Phillips received written warnings for their behavior.[10] (Doc. # 15, Tb. 10).

The plaintiff contends that Ms. Singleton, as a similarly situated non-minority employee, received favorable treatment on account of her race. The defendant maintains

---

[7]The record offers two names for this individual: Jackie Phillips and Margaret Phillips. The court has opted to use Jackie, since that is the name the parties have used in their respective briefs.

[8]Ms. Phillips was a department head at the time. (Doc. # 15, Tb. 7, p. 171). The court limits its discussion here to Ms. Singleton because, as a general rule, probationary and non-probationary employees are not legitimately compared. See, e.g., White v. Ohio, No. 99-4359, 2001 U.S. App. LEXIS 1085, at *9 (6th Cir. Jan. 18, 2001).

[9]"It is a very, very serious offense. An injection is an invasive procedure. This was a brittle diabetic. There are so many complications that can arise from insulin. And it has to be given subcutaneously. A licensed nurse allowing a nonlicensed, nonmedical person, very serious offense." (Doc. # 15, Ex. 9, p. 169).

[10]Plaintiff directs the court's attention to Ms. Singleton's disciplinary memorandum, and notes that the word "verbal" appears crossed out beneath the box labeled "Disciplinary." Although plaintiff would apparently have the court draw conclusions from this mark, the court notes that it, at best, leads to varying conclusions. The record demonstrates that Ms. Campbell made the disciplinary actions with respect to Ms. Singleton. (Doc. # 12, Ex. 3, pp. 200-03). However, the initials adjacent to the mark are "MC." (Doc. # 15, Ex. 11). Nevertheless, the evidence is at most circumstantial. See Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1083 n.2 (11th Cir. 1996).

that plaintiff's misconduct involved dramatically different conduct, thereby warranting the difference in discipline. (Doc. # 16, pp. 8-10). The court is cognizant that both plaintiff and Ms. Singleton share in common the status of probationary employee. The court is equally aware that, insofar as the gravity of the two instances is concerned, both parties committed acts that, under the Work Rules printed in the Lakeview employee handbook, could result in immediate termination. (Doc. # 12, Tb. 5, Ex. 1, p. 15). Furthermore, the plaintiff is correct in noting that both she and Ms. Singleton placed the welfare of a patient at risk. The similarities, however, stop here, and the differences that remain are outcome determinative.

Plaintiff's misconduct, as viewed by the defendant at the time of the disciplinary action, constituted two infractions under the Work Rules of the employee handbook: falsification of records; and gross negligence in the performance of job duties. (*Id.*; *see also id.*, Tb. 5, pp. 2-4; Doc. # 15, Tb. 13). The misconduct of Ms. Singleton evidently constituted only one serious infraction: gross negligence. (Doc. # 12, Tb. 3, pp. 200-03). Not only is this difference relevant in determining whether plaintiff and Ms. Singleton are properly compared, it largely disposes of the question. *See Bessemer Carraway Med. Ctr.*, 137 F.3d at 1312-13; *see also Silvera*, 244 F.3d at 1259.

The nature of the offense and the nature of the punishment are equally instructive though, and the court believes an inquiry here renders the issue academic. Looking first at the nature of the offense, the court finds that plaintiff's conduct must, at best, embrace a degree of patient neglect. Even with every inference taken in her favor (e.g., that she acted mistakenly in charting the Foley catheter), the plaintiff admittedly performed an incomplete assessment of her patient on successive nights. (Doc. # 12, Tb. 1, pp. 124, 131). Ms.

15

Singleton's conduct, on the other hand, does not involve patient neglect. Rather, her conduct involves actions – albeit actions tainted by poor judgment – with the welfare of a patient in mind. To liken the two situations would be akin to comparing apples and oranges – to use some of the cases' phraseology – and would, more importantly, second-guess an employer who saw fit to distinguish between an employee who acted erroneously, in an apparently tense situation, and an employee who neglected to act. Such is not the province of the court.

For similar reasons, the court believes the nature of the punishment meted out compels the same result. Employers are in the position to judge and estimate the capabilities of their employees, and determine how a probationary employee might learn from a mistake, if at all. Notwithstanding the potential severity of a given decision, that decision remains one for the employer, when properly ground and free of discriminatory bias.[11] The court thus finds that the disciplinary situation involving Ms. Singleton is not sufficiently comparable for purposes of establishing a prima facie case of discrimination.

Plaintiff's remaining comparisons are likewise due to fail. The situations that best evoke curiosity involve several non-minority employees who allegedly received favorable treatment after falsifying document entries and reports. (Doc. # 14, pp. 12-13). As the

_____

[11] As courts have observed, comparisons will often be made against the potential harm threatened or caused and the culpability of the offender. *See Moore v. Charlotte*, 754 F.2d 1100, 1107 (4th Cir. 1985). While both Ms. Singleton and Ms. Gray arguably placed their patients at risk, only Ms. Singleton's actions occurred under the watchful supervision of others. Moreover, the self-acknowledged culpability expressed by Ms. Singleton's disciplinary memorandum, as opposed to Ms. Gray's, further distinguishes these situations. (*Compare* Doc. # 15, Tb. 11; *with id.*, Tb. 13).

The court is cognizant that Ms. Crane opined that Ms. Singleton should have been terminated for her behavior. (Doc. # 15, Tb. 7, pp. 169-72). However, the opinion of one not ultimately responsible for the disciplinary action does not dispositively bear on the question of whether two disciplinary actions are properly compared. *See Anderson v. WBMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001); *see also Bessemer Carraway Med. Ctr.*, 137 F.3d at 1312 n.7.

defendant points out, however, the source of these allegations does not know for certain who was responsible and what, if anything, ever happened as a result. (Doc. # 15, Tb. 31, pp. 20-23). Furthermore, the defendant has provided undisputed testimony that the three employees who were disciplined for falsifying records received a less-severe sanction in part because they were no longer probationary employees. (Doc. # 12, Tb. 5, pp. 4-5). Notably, two of those three employees were of the same race as plaintiff. (Id.). Although this circuit has not directly addressed the issue, the circuit courts seem to generally agree that probationary and non-probationary employees rarely rise to the level of similarly situated. See, e.g., White v. Ohio, No. 99-4359, 2001 U.S. App. LEXIS 1085, at * 9 (6th Cir. Jan. 18, 2001) (and cases cited). The court thus finds that plaintiff has failed to identify any similarly situated non-minority employee at Lakeview who received favorable treatment.

As for the remaining allegations, the court finds that its discussion *supra* sufficiently disposes of any issues they might present.[12] Summary judgment is thus due to be, and is hereby **GRANTED** in favor of defendant on plaintiff's unlawful termination claim.

## B.    Plaintiff's Hostile Work Environment Claim

The magistrate judge also found that plaintiff's complaint stated a claim of a racially hostile work environment. (Doc. # 25, p. 2 & n.1). In support of this claim, the magistrate cited "evidence that white and black employees were treated differently in terms of

---

[12]Plaintiff's brief in response to defendant's motion for summary judgment recounts a rather sordid tale taking place behind the doors of Lakeview. But no matter how disconcerting these facts might be, they do not – insofar as they neither involve plaintiff or individuals similarly situated to her – bear upon whether or not *she* has come forward with a prima facie case of discrimination in her termination.

17

reprimands and working conditions." (*Id.*, p. 5).[13] After reviewing the submissions of the parties, the court believes the magistrate's recommendations are inaccurate in this regard.

The elements of a prima facie case of racially hostile work environment are: (1) plaintiff is a member of a protected class; (2) plaintiff was subjected to unwelcome racial harassment; (3) the harassment was based upon her race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create an abusive environment; and, (5) a basis for holding the employer liable. *See Shields v. Fort James Corp.*, No. 99-1045-S, 2001 U.S. Dist. LEXIS 5219, at *19 (S.D. Ala. April 9, 2001) (*citing Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582-83 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001)).

The defendant argues that plaintiff has not come forward with sufficient evidence to establish that the harassment in question was sufficiently severe and pervasive to alter the terms and conditions of her employment. *Cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The Eleventh Circuit has noted that this element of the hostile work environment claim "is the element that tests the mettle of most . . . harassment claims." *Gupta*, 212 F.3d at 583. Proof of this element "ensures that Title VII does not become a mere 'general civility code.'" *Id.* (*citing Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). In order to establish that the harassment to which a plaintiff was subjected was unlawful, she must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's

---

[13] The defendant argues that the magistrate never fully resolved this issue. (Doc. # 26, p. 7). A fair read of the report, however, seems to produce the conclusion that the magistrate found for plaintiff on this issue.

employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

To make such a showing, a plaintiff must demonstrate that her work environment was one that "a reasonable person would find hostile or abusive" and that she herself perceives as abusive. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (quotations omitted). In reviewing whether a reasonable person would find the plaintiff's workplace sufficiently hostile or abusive to warrant a claim of harassment, a court must assess:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

*Id.* (citations omitted). Thus, this court is called upon to "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.* (citations omitted).

> [The court's] consideration of this case, especially the hostile environment issue, has been hampered by plaintiff's brief. . . . Plaintiff's statement of facts, consuming more than half of her brief, is a mixture of facts and arguments and inferences. It is larded with allegations, hearsay, hyperbole, and pejoratives. It makes no effort to distinguish between inferences and facts or to present facts unfavorable to the plaintiff.

*Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 n.7 (11th Cir. 1995). Especially disruptive to the court's analysis have been plaintiff's allegations that, while breathing some life into her claim, really have no relation whatsoever to the conditions of her employment.

19

It is true that courts are required to consider the totality of circumstances in assessing the "mettle" of a hostile environment claim. But the circumstances relevant here do not include those matters that fail to bear on the period of plaintiff's employment. And once the flotsam and jetsam of plaintiff's brief are discarded, the evidence proffered simply does not appear sufficient to withstand defendant's motion for summary judgment. *Cf. Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 192-200 (4th Cir. 2000)

A thorough analysis of certain events are critical to this conclusion. The first concerns the hiring of plaintiff. According to plaintiff's deposition testimony, she was offered full-time employment at Lakeview by Ms. Crane and Ms. Campbell, pending the completion of an application and orientation. The offer apparently arose as a result of plaintiff's existing employment at the facility through a temporary placement agency. Upon learning of this and the facility's need for personnel, plaintiff recommended to a non-minority male friend, Timothy Smith, that he seek employment with Lakeview. When Mr. Smith did this, he was immediately hired, and plaintiff was subsequently informed that she would not be needed. Plaintiff and Mr. Smith subsequently revealed to the Lakeview administration that they were friends, and that Mr. Smith would not accept the position if it meant jeopardizing his friend's opportunity. Thereafter, both Mr. Smith and plaintiff were offered employment at Lakeview. (Doc. # 15, Tb. 52, pp. 19-28).

In retrospect, this instance might be seen as a portent of the above-styled action. But when endowed with present-tense restraint and objectivity, the facts recount a far less troubling event. Plaintiff acknowledges that she had not filled out her application (or been scheduled for orientation) when Mr. Smith applied, filled out his paperwork, and was hired.

20

(*Id.*, p. 24). Moreover, she admits that both parties were ultimately hired for separate positions. (*Id.*, p. 27-28). And although equally impermissible, the court does not find it out of the realm of possibility that the hiring decision turned on Mr. Smith's being a male, as opposed to his being Caucasian. Frankly put, plaintiff's evidence suggests several things – impermissible discrimination being only one – but in light of the fact that plaintiff has come forward with no additional facts demonstrating an impact upon her conditions of employment, the court cannot realistically conclude that the inferences surrounding plaintiff's hiring created or fostered a racially hostile work environment.

A second instance that apparently caught the attention of the magistrate involved alleged segregation at the lunch table. Plaintiff stated in her deposition testimony that non-minority employees ate in a room separate from the minority employees and apparently received catered food. (Doc. # 15, Tb. 60, pp. 165-70). Plaintiff admitted, however, that anyone could eat in the room. (*Id.*, p. 169). Plaintiff also stated that she didn't regularly eat in the room "because I didn't regularly eat, period." (*Id.*). The court acknowledges that the fact that some non-minority employees allegedly offered the minority employees leftovers might be construed in a negative fashion. (*Id.*, p. 168). But the fact that plaintiff never actively sought or was refused to join the non-minority employees at lunch strongly mitigates against a finding of hostility. As defendant observes, plaintiff's complaint here seems to present concerns about civility, as opposed to impermissible hostility in the workplace. *See Gupta*, 212 F.3d at 587.[14]

---

[14]A similar situation involves alleged racial epithets used by Johhnie Weathers. Although several individuals testified that Mr. Weathers made such statements or made other derogatory comments concerning minority employees, the plaintiff admits that she never heard as much. (Doc. # 12, Tb. 1, p. 175-76). Plaintiff's

Plaintiff also cites a situation where Ms. Crane ordered her to come to work after plaintiff had informed her that her legs were swollen and she could not work. (Doc. # 12, Tb. 1, pp. 38-39). While plaintiff states that she believes Ms. Crane did this on account of her race, plaintiff also states that Ms. Crane, upon determining the severity of plaintiff's ailment, allowed her to leave and offered to take her home herself. (*Id.*, pp. 39, 171-72). This situation bears no apparent connection to racial animus, and when objectively viewed seems to represent, at the most, a misunderstanding by Ms. Crane of the severity of plaintiff's condition. It certainly does not constitute a hostile work environment.

Finally, the court pauses to address some general concerns raised by plaintiff as they pertain to her hostile work environment claim. Plaintiff's brief recounts a multitude of situations and occurrences – some occurring at Lakeview, some apparently occurring at another facility – which she avers as establishing a hostile work environment. The fallacy of this assertion, however, is that with a small exception, these instances all involved other people. And, with the exception of gossip around the workplace, plaintiff has not come forward and established how these situations objectively and subjectively created a hostile work environment for her. (Doc. # 12, Tb. 1, p. 39).

For example, she claims that she and other minority employees were singled out and disciplined for tardiness. (Doc. # 14, p. 4). However, the first time plaintiff was reprimanded for being late was when she received her disciplinary memorandum regarding the erroneously assessed Foley catheter, approximately seven days before she

---

allusion to trees falling in woods notwithstanding (Doc. # 14, p. 20), the law is clear that, insofar as Mr. Weathers' alleged behavior is concerned, plaintiff needs to have heard the proverbial tree fall to substantiate her subjective perception of a hostile workplace. *See Edwards v. Wallace Comm. College*, 49 F.3d 1517, 1522 (11th Cir. 1995).

was officially terminated for that very conduct. (Doc. # 15, Tb. 13; Tb. 24, p. 134). And as Ms. Crane explained in her deposition testimony, the day in question on which plaintiff was reprimanded was a significant office day because it witnessed state surveyors inspecting the facility. (Doc. # 12, Tb. 2, pp. 56-57). Plaintiff also describes instances when minority employees were told to perform the tasks of non-minority employees; when a minority employee's office was given to a non-minority employee; and when non-minority employees were not disciplined for failing to place appropriate medicinal needs on the medicine cart. (Doc. # 14, Tb. 1, pp. 40-41; 115-16; 118-20). As to the last point, the court notes that the evidence submitted simply does not demonstrate selective disciplining. As to plaintiff's initial point, she herself admits that the directive to perform the tasks of non-minority employees came in the form of Ms. Crane notifying plaintiff and others to correct errors that might have been made by another nurse. Furthermore, plaintiff herself stated that the nurses tended to voluntarily aid one another. (Doc. # 12, Tb. 1, pp. 116, 121). As for the middle point, the court acknowledges the concerns fostered by the implications of this event. But as an isolated, third-party instance, presented through a sparsely developed recollection, it simply does not satisfy the burden plaintiff shoulders.

This analysis is of course incomplete without consideration of whether these instances, considered in the aggregate, satisfy plaintiff's burden. *See Schrader-Bridgeport Int'l*, 227 F.3d at 192-200. The court does not believe that they do. Given plaintiff's abbreviated tenure with Lakeview, these instances may well qualify as occurring on a frequent basis. But in light of what the record reveals, the court does not view these instances as severely altering plaintiff's working conditions. Furthermore, the court does

23

Case 2:99-cv-02991-ELN Document 30 Filed 10/15/01 Page 24 of 24

not in the least see these instances as jeopardizing the health and safety of plaintiff. Whatever went on at Lakeview in and around the time of plaintiff's employment seems to have sparked quite the litigious conflagration. (Doc. # 23, Acker, J.). But insofar as Ms. Gray herself is concerned, there simply does not appear to be sufficient air to sustain her claim of a racially hostile work environment. Summary judgment is thus due to be, and is hereby **GRANTED** in favor of defendant on plaintiff's hostile environment claim.[15]

## V.     Conclusion.

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___14th___ of October, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

---

[15] Insofar as plaintiff's complaint might have pleaded a claim of illegal hiring under Title VII or 42 U.S.C. § 1981, the court agrees with defendant that these claims are barred. Insofar as a claim of hiring discrimination under Title VII is concerned, the court finds such a claim to be beyond the scope of the administrative charge. *See Alexander v. Fulton County*, 207 F.3d 1303, (11th Cir. 2000) ("The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation."); *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985); *see also* Doc. # 12, Tb. 4. Insofar as a claim under § 1981 is concerned, the court agrees with the defendant that such a claim is time-barred, as having been filed more than two years after the hiring occurred. *See Alexander*, 207 F.3d at 1346; *see also Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 & n.16 (11th Cir. 1998).

24